David Tykulsker, Esq. (2609)
David Tykulsker & Associates
161 Walnut Street
Montclair, NJ 07042
(973) 509-9292 (office)
(973) 509-1181 (facsimile)
david@dtesq.com
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN PAUL PATAFIO, ZACHARY ARCIDIACONO and HAILE DABREO, <br><br>　　　　　　Plaintiffs, <br>　　　　v. <br><br>LOCAL 100, TRANSPORT WORKERS UNION, <br><br>　　　　　　Defendant. | VERIFIED COMPLAINT <br><br>Civil Action No. |

**INTRODUCTION**

1.　Plaintiff John Paul Patafio, Zachary Arcidiacono and Haile DaBreo bring this Complaint to redress the failure to disclose the written employment agreement that Local 100 signed with its former President Richard Davis following his resignation for serious sexual misconduct, and to disclose records setting forth the union duties that former President Davis has performed under that employment agreement, which appears to be nothing more than a corrupt misuse of union resources for a no-show job for a sexual predator.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401 *et seq.*, and specifically through 29 U.S.C. § 431( c).

3. This Court has personal jurisdiction over the Defendant as the Defendant has a principal place of business in Kings County, New York, within this District.

## PARTIES

4. Plaintiff John Paul Patafio is a resident of New Jersey. He is the former Vice-President of TWU, Local 100 for NYC Surface Maintenance/Surface Transit, in essence the bus drivers and mechanics for the New York City Transit Authority, and a member of Local 100.

5. Plaintiff Zachary Arcidiacono is a resident of New York, and the former Chair of Train Operators Division B of Local 100 and a member of Local 100.

6. Plaintiff Haile DaBreo is a resident of New Your and a member of Local 100 and serves as the 3rd Vice Chair for Local 100 in his bus depot.

7. Defendant Local 100 is a labor organization within the meaning of 29 U.S.C. § 402, inasmuch as its members include employees working in the private sector, as well as employees of the Metropolitan Transportation Agency ("MTA"),  with a principal place of business at 195 Montague Street, Brooklyn, NY 11201.

## STATEMENT OF FACTS

8. Plaintiff Patafio at all relevant times has been a member of Local 100, and is currently a member of Local 100.

9. Plaintiff Arcidiacono at all relevant times has been a member of Local 100, and is currently a member of Local 100.

10. Plaintiff DaBreo at all relevant times has been a member of Local 100, and is currently a member of Local 100.

11. Local 100, is governed by its ByLaws, a true copy of which is annexed hereto as Exhibit A.

12. Local 100 is affiliated with the Transport Workers of America, AFL-CIO ("TWU").

13. Pursuant to the ByLaws, the membership of Local 100 is divided into various divisions based on the members' job duties in the New York City public mass transit system with a separate division for the employees of the private bus lines organized by Local 100.

14. The members of each division of Local 100 elect a Vice-President who serves on the Local 100 Executive Committee and Executive Board.

15. In addition to the departmental Vice Presidents, the Executive Committee consists of the President, the Secretary-Treasurer, the Recording Secretary and the Administrative Vice President.

16. Plaintiff Patafio has been a member of Local 100 since 1996 and has held multiple elected positions within the union including but not limited to Depot Chair and Division Chair.

17. Plaintiff Patafio was first elected Vice President for NYC Surface Maintenance/Surface Transit in 2012. Most recently, Plaintiff Patafio was reelected to this position in 2024 with over 75% of the vote.

18. As the Vice President for NYC Surface Maintenance/Surface Transit, Plaintiff Patafio was a member of the Local 100 Executive Committee and Executive Board.

19. In the first weeks of January, 2025, Richard Davis was the President of Local 100.

20. Davis had been elected President of Local 100 on a slate with John Chiarello who was elected as the Secretary-Treasurer. Davis and Chiarello had been slatemates in the previous two elections as well.

21. Attached as Exhibit B is Schedule 11 of Local 100's LM-2 report for 2024, which sets forth the salary and other compensation received by officers of Local 100.

22. As can be seen from Exhibit B, President Davis's salary in 2024 was $210,950.

23. Officers and employees of Local 100 are eligible participate in the TWU Local 100 Staff Pension Plan ("Local 100 Pension Plan"), and are the only participants in the Local 100 Pension Plan.

24. Benefits, administrative costs and all other obligations of the Local 100 Pension Plan are funded primarily by contributions from Local 100.

25. Upon information and belief, the benefits payable by the Local 100 Pension Plan to a participant i.e. an officer of Local 100 are calculated based on the participant's salary for the last three years of employment with Local 100.

26. In or about January, 2025, the TWU International received allegations of serious sexual misconduct by Davis in which he used his office as the chief executive of Local 100 to facilitate his sexual misconduct. The TWU International then directed a prompt investigation into these allegations by an independent attorney.

27. On or about January 19, 2025, the TWU International received a report from the independent attorney indicating that the allegations of Davis's misuse of his office to engage in sexual misconduct were likely substantially correct. A true copy of that report is annexed hereto as Exhibit C.

28. On January 21, 2025 the TWU International found that there was substantial credible evidence that Davis had used his office as President to commit serious sexual misconduct, and suspended him from his position as President of Local 100, pending the outcome of a trial on the merits. A true copy of this finding, suspension and announcement of a trial is annexed hereto as Exhibit D.

29. In particular, the TWU International found that there was good cause to believe that Davis had "pressur(ed) a woman employed by Local 100 into having sexual relations with you. This conduct allegedly occurred on multiple occasions. Some time after the sexual relationship ended, you took adverse employment action against this person, allegedly in connection with the cessation of the sexual relationship."

30. On January 21, 2025, i.e. on the day that Davis was suspended from the Presidency of Local 100, Davis advised that he was unable to perform his job as President of Local 100 due to unspecified illness and went on indefinite sick leave. A true copy of the announcement of this disability and leave is annexed hereto as Exhibit E.

31. The day following his suspension from his position as President of Local 100, on or about January 22, 2025, Davis resigned from his position as President of Local 100 rather than face a trial on the merits of the charge of serious sexual misconduct. As a result, no trial of Defendant Davis was had.

32. However, and notwithstanding Davis's effective admission by conduct that he had used his union office to commit serious sexual misconduct, Davis was not deprived of his

membership in Local 100 including but not limited to his right to vote in Local 100 elections.

33. Immediately upon Davis leaving office, officers of Local 100 falsely put out to the members of Local 100 that Davis had resigned from the Presidency due to illness rather than honestly stating that he had been suspended due to credible allegations of serious sexual misconduct and chose not to contest those charges.  A true copy of one such message is attached hereto as Exhibit F.

34. In addition to notifying the members that Davis had falsely retired due to health reasons, Local 100 put out to mass circulation newspapers to the same effect.  A true copy of the AM New York article of January 26, 2025 in which this false statement is reported is annexed hereto as Exhibit G.

35. On or about January 28, 2025, John Samuelson, President of the TWU International wrote an open letter to the members of Local 100 summarizing Defendant Davis's serious sexual misconduct and stating that this "behavior is appalling." A true copy of President Samuelson's January 28, 2025, open letter is annexed hereto as Exhibit H.

36. Notwithstanding that former President Davis had already resigned from his office, and notwithstanding his effective admission of wrongdoing, Chiarello then immediately negotiated a deal with Davis to have him become an employee of Local 100 for two years at his former salary with health benefits paid by Local 100.("the Maintenance of Employment Deal" or "MOED").

37. The MOED was agreed-to by Chiarello on behalf of Local 100 and Davis no later than January 24, 2025.

38. The Maintenance of Employment Deal with Defendant Davis is the type of major commitment of Local 100 funds that is reserved under the Local 100 By-Laws to the Executive Board, whose, Article VIII (B) "shall be the supreme governing body in the Local Union," subject only to revision by decision of the membership.  See Exhibit A.

39. There was absolutely no reason why approval of the MOED could not have awaited the monthly meeting of the Executive Board of Local 100.

40. Within three days of Davis's suspension and then resignation from the Presidency of Local 100, the Executive Committee met on Friday January 24, 2025, to consider the MOED.  As a Vice President of Local 100, Plaintiff Patafio attended this meeting.

41. The full written MOED agreement was not presented to the Executive Committee in advance of the meeting.

42. Upon learning that the MOED was going to be discussed at the January 24 Executive Committee meeting, Plaintiff Patafio requested that the written MOED be presented to the full Executive Committee before voting on whether to approve it.  Defendant Local 100 refused to present the written MOED to the Executive Committee at any time during the January 24, 2025, Executive Committee meeting or in any of the six months following.

43. Chiarello presented a verbal explanation of the contents of the MOED at the January 24 Executive Committee meeting.  Chiarello explained that under the terms of the MOED, Davis would have an official position on the payroll with Local 100, for a period of two years with health benefits, as well as a union-paid car for at least the first 6 months. Chiarello then went on to say that the MOED did not specify any particular job duties to be performed by Davis.  In addition, as explained by Chiarello, the MOED purported to bind Local 100 to saying falsely that Davis resigned from office due to physical illness

rather than that he had in fact resigned due to his misuse of his office to facilitate serious sexual misconduct.

44. After hearing Chiarello's oral exposition of the contents of the MOED, Plaintiff Patafio asked the rhetorical question of whether Davis was going to be paid for two years and do s**t? Chiarello responded you don't want us to be sued; let's avoid costly litigation.

45. In response, Plaintiff Patafio then moved to have the MOED distributed to the Executive Committee. That motion was ruled out of order by Chiarello.

46. Plaintiff then vigorously opposed the Executive Committee's approval of the MOED, describing the MOED as more like a reward than as a punishment, and as an improper waste of union resources and rewarding sexual harassment, and urged that approval of the MOED be deferred to the monthly Executive Board meeting.

47. Nevertheless, over Plaintiff's sole and strong objection, the Maintenance of Employment Deal was approved by the Executive Committee at the January 24, 2025, meeting.

48. Because Davis had been President of Local 100 at an annual salary of $210,950 for a year prior to his resignation, and because the Maintenance of Employment Deal requires that Davis continue as an employee for two years, the MOED necessarily requires Local 100 to make additional contributions from Local 100 to the Local 100 Pension Fund to fund Davis's retirement benefits based on an annual salary of $210,950.

49. Thus, the Maintenance of Employment Deal appears to involve a commitment by Local 100 to expend approximately $500,000 in union resources.

50. On Monday, January 27, Plaintiff Patafio emailed the Executive Committee, stressing that they had not seen the Maintenance of Employment Deal, and summarizing his opposition to the MOED, a true copy of which is annexed hereto as Exhibit I.

51. Over the next several months, Plaintiff Patafio followed up individually with several members of the Executive Committee to see if they would support a review of the actual terms of the Maintenance of Employment Deal.  It became clear over this period that no one on the Executive Committee was willing to review the contents of the Maintenance of Employment Deal.

52. The MOED has never been presented to the Executive Board nor to the membership for their approval.

53. Section 201 of the LMRDA obliges any union, including Local 100, to report any monies paid to employees or consultants.

54. The payments made to Davis pursuant to the MOED will have to be reported by Local 100 on its LM-2 report to the US Department of Labor for calendar year 2025 which has yet to issue.

55. Because employees generally are only required to pay union dues sufficient to cover the union's representational activities, Local 100 requires its employees to keep track of their time, so that the employee's time may be apportioned between representational and non-representational activities, and non-members' dues adjusted accordingly.

56. A true copy of a sample time sheet is submitted herewith as Exhibit J.

57. The percentage of time spent on representational versus non-representational activities is duly reported on the Local 100 LM-2.  A true copy of Schedule 12 from the Local 2024 LM-2 report is annexed hereto as Exhibit K.

58. As set forth in Exhibit K, employees of Local 100 can be reimbursed for work-related costs.

59. Local 100 requires its officers to employees to submit promptly their claimed work-related expenses on standard forms, covering meals, auto and miscellaneous expenses. A true copy of a sample of each form is annexed hereto as Exhibit L.

60. Generally, the job of an employee of Local 100 is similar in its physical requirements to that of the President, in that they are generally relatively sedentary office jobs. Particularly given that President Davis claimed sick leave from his job as President of Local 100 due to illness, and given that Local 100 officers have repeatedly stated that Davis resigned from the Presidency of Local 100 due to physical illness, whether Davis has at any time recovered sufficiently so that he would in fact be capable of performing the job duties of a Local 100 employee warrants further inquiry.

61. Even if the MOED were somehow deemed to be an agreement to hire former President Davis as an independent contractor, the payments made by a union to an independent contractor must be reported on the LM-2 in Schedules 15 and 16, the former for payments made to contractors for representational services and the latter for non-representational political activities and lobbying. True copies of Defendant Local 100's Schedule 15 and 16 from its 2024 LM-2 report are annexed hereto as Exhibits M and N respectively.

62. Plaintiffs have repeatedly sought to learn what union functions former President Davis is currently performing. To date, no one has been able to provide any information as to these functions.

63. Attached as Exhibit O is a true copy of a request to inspect the pertinent records by Plaintiffs. Exhibit O was served on Defendant on November 3, 2025.

64. A true copy of the service of Exhibit O on Defendant is annexed hereto as Exhibit P.

65. As of the filing of this Complaint, Plaintiffs have received no response to Exhibit O.

66. As of this date, Defendant has failed to provide access to the records pertaining to Mr. Davis's employment by Local 100 pursuant to the MOED.

67. As set forth in Exhibit O, the foregoing facts are sufficient for Plaintiffs to believe reasonably that the Maintenance of Employment Deal represents a corrupt agreement among union officers and slatemates that wastes union resources on a no-show job for a sexual predator, and hence further inquiry is warranted.

## CAUSE OF ACTION

68. Plaintiffs repeat the foregoing as if fully stated herein.

69. Plaintiffs have just cause to examine the Maintenance of Employment Deal and all records pertaining to Davis's work activity pursuant to the Maintenance of Employment Deal because there is a reasonable basis to believe that Davis has been given a no-show job that amounts to an illegal waste of union resources such that further inquiry is warranted.

**WHEREFORE,** Plaintiffs demand judgment of Defendant,

a. Declaring that Plaintiffs have just cause to examine the Maintenance of Employment Deal and all records pertaining to Richard Davis's work activity pursuant to the Maintenance of Employment Deal;

b. Ordering that Defendant immediately grant Plaintiffs full access to examine and copy the Maintenance of Employment Deal and all records pertaining to Richard Davis's work activity, including but not limited to, statements of hours worked and claimed reimbursement of expenses since January 24, 2025;

    c. Granting Plaintiffs their reasonable attorney's fees and costs; and

    d. Affording Plaintiffs such other relief as the Court may determine is fair and just.

                                             Respectfully Submitted

                                             /s/David Tykulsker

                                             David Tykulsker, Esq.
                                             David Tykulsker & Associates
                                             161 Walnut St.
                                             Montclair, NJ 07042
                                             (973) 509-9292 (phone)
                                             (973) 509-1181 (fax)
                                             david@dtesq.com

Dated: November 24, 2025